FILED 18 JUL '17 16:19 USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:17-CR-273-HZ |
| v. | **INFORMATION** |
| DENNIS BALIUS, | 18 U.S.C. §§ 1341 and 2 |
| Defendant. | |

THE UNITED STATES CHARGES:

**Count 1**
**(Mail Fraud)**
**(18 U.S.C. §§ 1341 and 2)**

1. From at least in or around 2002 through in or around July 2015, in a continuing course of conduct, in the District of Oregon and elsewhere, Defendant **DENNIS BALIUS** aided and abetted by others known and unknown to the United States, did knowingly and with an intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises knowing that the pretenses, representations, and promises were false and fraudulent when made.

**General Allegations**

*The Defendant and Relevant Entities*

2. Company A is an Oregon corporation headquartered in Rosemont, Illinois that manufactures aluminum extrusions for use in a variety of applications, including rockets, military hardware, airplane seats, and windows.

1

3.     **DENNIS BALIUS** ("**BALIUS**") is a resident of Portland, Oregon. **BALIUS** was a tensile lab supervisor at Company A from in or about 2003 through in or about September 2015. His responsibilities included overseeing the tensile testing lab, reviewing test results, training the lab technicians, and conducting floor audits.

### *Background and Terminology*

4.     ASTM International is an organization that sets mechanical properties requirements for each temper and alloy of aluminum. Aluminum is produced in a variety of alloys (specific chemical combinations of aluminum and small amounts of other metals) and tempers (which designate how the metal is treated immediately after its creation).

5.     Aluminum extrusions are made by pushing aluminum billets (*i.e.*, aluminum in a round, square, rectangular, or hexagonal bar shape), at different speeds and temperatures, through a die to produce a specific shape needed by a customer. Depending on the mechanical properties requirements needed, the aluminum extrusion is then quenched (*i.e.*, rapidly cooled either by misting water on it, blowing air on it, or dunking it in water, etc.). Subsequently, the aluminum extrusion goes through a process called stretching, which ensures that the aluminum extrusion is straight. In some instances, the aluminum extrusion is then put through a heat treating process (*i.e.*, the metal is placed into a large oven at different temperatures and for different lengths of time) to ensure that the extrusion reaches the required hardness.

6.     Tensile testing is conducted after manufacture and measures three critical mechanical properties of an aluminum extrusion sample: yield strength, ultimate tensile strength, and elongation. Tensile testing is a process by which a small sample of aluminum extrusion is slowly stretched and then ripped apart by a tensile testing machine, which measures the force applied to the aluminum sample at each stage of the test.

7. Yield Strength ("yield") is the point at which the aluminum extrusion sample becomes permanently and irreversibly deformed during tensile testing.

8. Ultimate Tensile Strength ("UTS") is calculated from the maximum amount of stress an aluminum extrusion can sustain before the aluminum extrusion sample breaks during tensile testing.

9. Elongation is the increase in the length of the aluminum extrusion sample before it breaks during tensile testing. Elongation is measured after the sample fractures by fitting the two halves of the broken sample together.

### Purposes of the Scheme and Artifice

10. The purposes of the scheme were to (a) conceal failing test results on Company A aluminum extrusions to prevent slower production rates and any potential loss in profits caused by the rejection or return of non-conforming extrusions by customers and (b) obtain bonuses from Company A, which were calculated in part based on a production metric.

### Scheme and Artifice

11. The manner and means by which **BALIUS** and others would and did carry out the scheme and artifice, included, but were not limited to, the following:

    a. knowing Company A would not ship finished orders to customers without a passing mechanical properties certification from the tensile testing lab where **BALIUS** worked as a supervisor, **BALIUS** and others fraudulently altered mechanical properties test results, which included elongation, ultimate tensile strength, and yield, by:

        i. altering failing test results so they would "pass" by conforming failing results with ASTM specifications that were dictated by contract between customers and Company A;

  ii. cutting samples to sizes outside ASTM specifications knowing the sample would more likely pass;

  iii. testing samples unrelated to the batch that would ultimately be certified and shipped knowing certain unrelated samples would more likely pass; and

  iv. altering test results using Company A's computer software by either manipulating real data or entering passing test results without actually performing a test;

b. training employees in the lab on how to alter mechanical properties testing results;

c. creating a set of written procedures for lab technicians to consult for instruction on how to alter mechanical properties test results;

d. reviewing lab technicians' questions about whether to alter test results, and on numerous occasions, directing employees by email, notes, or orally, to "move up" specific failing test results, in other words, to fraudulently change failing results to passing results;

e. instructing lab technicians not to discuss the alterations in the lab with anyone else at Company A, and on at least one occasion, telling a lab technician "what happens in the lab, stays in the lab," to ensure the scheme's ongoing success;

f. increasing the speed of the Company A tensile testing machine to test more samples, and therefore ship more orders, in excess of ASTM specifications;

g.  reducing the tensile testing machine speed to specified levels before lab audits or customer visits to prevent outsiders from detecting the machine's otherwise excessive speed;

h.  performing only one retest on failing samples, despite ASTM specifications that dictate that a failed sample must pass two retests before it may be deemed to meet ASTM specifications; and

i.  fraudulently allowing Company A to mail mechanical properties test certifications to customers with their orders knowing the certifications contained false information.

## Use of the Mail

12. On or about the date specified below, the Defendant, for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, knowingly deposited and caused to be deposited the matters and things listed below to be sent and delivered by the United States Postal Service or private or commercial interstate carrier:

| COUNT | APPROXIMATE DATE | DESCRIPTION |
|---|---|---|
| 1 | March 20, 2014 | A fraudulent Certificate of Mechanical Properties on behalf of Company A sent and delivered via private or commercial interstate carrier from Company A's plant in Portland, Oregon to Customer A's address in Renton, Washington. Customer A would not have accepted the materials if it had known the Certificate falsely represented that the materials met ASTM specifications. |

In violation of 18 U.S.C. §§ 1341 and 2.

Dated this 18th day of July 2017.

Respectfully submitted,

SANDRA MOSER
ACTING CHIEF
FRAUD SECTION

By: _____
Thomas B.W. Hall
Assistant Chief
Jennifer G. Ballantyne
Trial Attorney
Emily Scruggs
Trial Attorney