

July 14, 2017

Mr. Whitney Boise
Ransom Blackman LLP
1001 SW Fifth Avenue, Suite 1400
Portland, Oregon 97204

      Re:    *United States vs. Dennis Balius*
               Plea Agreement Letter

Dear Counsel:

1.    **Parties/Scope**:  This plea agreement is between the Fraud Section of the Criminal Division of the United States Department of Justice ("DOJ") and Dennis Balius, the Defendant, and thus does not bind any other federal, state, or local prosecuting, administrative, or regulatory authority. This agreement does not apply to any charges other than those specifically mentioned herein.

2.    **Charges**:  The Defendant agrees to plead guilty to a one-count Criminal Information, which charges the crime of Mail Fraud, in violation of Title 18, United States Code, Section 1341 and 2.

3.    **Elements**: In order for the Defendant to be found guilty, the government must prove the following elements beyond a reasonable doubt:

The Defendant:

(1) Knowingly participated in, devised, intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

(2) Made statements or omitted facts as part of the scheme that were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3) Acted with the intent to defraud, that is, the intent to deceive or cheat; and

(4) Used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

4.    **Admissions**: As part of the plea agreement, the Defendant admits the elements of the offense and agrees the DOJ could prove the following:

*The Defendant*

The Defendant was a Tensile Lab Supervisor at Company A, an Oregon corporation headquartered in Rosemont, Illinois, from in or about 2003 through in or about September 2015. At various points throughout his employment as a Tensile Lab Supervisor, the Defendant's responsibilities included overseeing the main tensile testing lab (the "lab"), reviewing test results, training the lab technicians, and conducting floor audits. Prior to becoming a supervisor, the Defendant began working in the lab in or about 1996. The Defendant first began working at Company B on or about February 21, 1977. In or about 2000, Company B was acquired by Company A.

*Background and Terminology*

Company A manufactures aluminum extrusions for use in a variety of applications, including the aerospace industry, military hardware, airplane seats, and windows. ASTM International is an organization that sets mechanical properties requirements for each temper and alloy of aluminum. Aluminum is produced in a variety of alloys (specific chemical combinations of aluminum and small amounts of other metals) and tempers (which designate how the metal is treated immediately after its creation).

Aluminum extrusions are manufactured by pushing aluminum billets (*i.e.*, aluminum in a round, square, rectangular, or hexagonal bar shape), at different speeds and temperatures, through a die to produce a specific shape needed by a customer. Depending on the mechanical properties requirements needed, the aluminum extrusion is then quenched (*i.e.*, rapidly cooled either by misting water on it, blowing air on it using fans, or dunking it in water, etc.). Subsequently, the aluminum extrusion goes through a process called stretching, which ensures that the aluminum extrusion is straight. In some instances, the aluminum extrusion is then put through a heat treating process (*i.e.*, the metal is placed into a large oven at different temperatures and for different lengths of time) to ensure that the extrusion reaches the required hardness.

Tensile testing measures three critical mechanical properties of an aluminum extrusion sample: yield strength, ultimate tensile strength, and elongation. Tensile testing is a process by which a small sample of aluminum extrusion is slowly stretched and then ripped apart by a tensile testing machine, which measures the force applied to the aluminum sample at each stage of the test. Yield Strength ("yield") is the point at which the aluminum extrusion sample becomes permanently and irreversibly deformed during tensile testing. Ultimate Tensile Strength ("UTS") is calculated from the maximum amount of stress an aluminum extrusion can sustain before the aluminum extrusion sample breaks during tensile testing. Elongation is the increase in the length of the aluminum extrusion sample before it breaks during tensile testing. Elongation is measured after the sample fractures by fitting the two halves of the broken sample together.

*The Defendant's Participation in the Alteration Scheme at the Main Tensile Testing Lab*

The Defendant was first taught how to alter mechanical properties results when he began to work in the lab in or about 2002 in order to ensure that Company A's and Company B's unreliable and inconsistent production practices would not prohibit aluminum extrusions from shipping to customers. In or about 2006, Company A transitioned to using the Axapta software, which allowed test certifications to ASTM specifications for customers to be produced directly from the software system. The Defendant informed D.M. – the production manager at Company C, a division of Company A – that alterations were occurring in the lab and that he was going to change some mechanical properties test results. D.M. agreed with the changes.

After taking over as a supervisor in or about 2003 and throughout the course of scheme, the Defendant supervised 21 lab technicians. As a supervisor:

1)     The Defendant trained and directed other lab technicians to train new hires to falsify mechanical properties results.

2)     The Defendant created a set of written procedures to inform lab technicians of how to alter test results. Originally, these procedures were intended to allow lab technicians to correct typographical errors; however, the procedures were later used to alter failing test results to passing test results.

3)     The Defendant instructed lab technicians that if a sample failed, they only needed to perform one retest. If the retest passed, the lab passed the mechanical properties tests, even though the ASTM specifications required two passed retests.

4)     The Defendant routinely falsified and instructed lab technicians to falsify elongation results, in spite of the ASTM specifications.

5)     The Defendant instructed the lab technicians to increase the speed of the tensile testing machine, in spite of the ASTM specifications. The Defendant also instructed the lab technicians to turn the speed of the tensile testing machine back down before customer visits or lab audits.

6)     The Defendant cut, or instructed lab technicians to cut, samples for mechanical properties testing to sizes outside of ASTM specifications.

7)     The Defendant made, or directed lab technicians to make, alterations to failing mechanical properties test results, if the shipping department asked the Defendant to rush an order because ensuring on time delivery of aluminum helped the Defendant and other employees at Company A to receive bonuses.

8) The Defendant instructed at least two lab technicians not to discuss the alterations occurring in the lab with anyone else at Company A.

9) The Defendant routinely performed, or instructed the lab technicians to perform, hardness testing on samples, and work in process materials, that failed tensile testing. The Defendant changed or instructed others to change the tensile test results if the hardness test results were passing.

10) The Defendant, after in or about 2012, would receive Post-it notes from lab technicians requesting input on how to falsify test results. In some instances when the lab technicians brought the Defendant Post-It notes with failing tensile test results, the Defendant accessed the results in Company A's computer software and altered them himself.

11) The Defendant gave guidance to lab technicians on whether or not to make alterations to mechanical properties test results via e-mail.

On or about March 18, 2014, the Defendant emailed a lab technician about a tensile test for Customer A stating, "move up," which indicated that the Defendant wanted the lab technician to falsify the failing mechanical properties results to passing. On or about March 20, 2014, Company A, within the District of Oregon, shipped Customer A, in Renton, Washington, the fraudulent Certificate of Mechanical Properties indicating that the order passed testing in accordance with the ASTM specifications. Customer A would not have accepted the materials if it had known the Certificate falsely represented that the materials met ASTM specifications.

*Consequences of the Scheme*

As a result of the alterations scheme, Company A determined, based on its review of available records, the Defendant and other Company A employees altered the mechanical properties of Company A's aluminum extrusions approximately 4,126 times, which allowed Company A to avoid slower production rates, a loss in profits, and customers refusing to accept the non-complying aluminum. Company A calculated that, as a result of the alterations scheme, which impacted approximately 251 customers of Company A, Company A grossed approximately $6,828,434.26 in total sales from the altered mechanical properties test results. Finally, as a result of the alterations scheme, from in or about 2002 to in or about 2015, the Defendant made $51,412.50 in bonuses, which were tied in part to a production metric.

*Conclusion*

The Defendant's actions in furtherance of the offense charged, including but not limited to the acts described above, were done willfully, knowingly, with the specific intent to violate the law, and not because of accident, mistake, or other innocent reason. The Defendant's actions were within the District of Oregon. Finally, the foregoing is a summary of the principal facts that constitute the legal elements of the offense of mail fraud. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine the Defendant's sentence under the Sentencing Guidelines. The Defendant acknowledges that the foregoing does not describe all of the Defendant's conduct relating to the offense charged, nor does it identify all the persons with whom the Defendant may have engaged in illegal activities.

5.      **Penalties**: The maximum sentence is 20 years imprisonment, a fine of $250,000, no more than three years supervised release, and a $100 fee assessment. The Defendant agrees to pay the $100 fee assessment by the time of entry of guilty plea or explain to the Court why this cannot be done.

6.      **Dismissal/No Prosecution**: The DOJ agrees to not bring additional charges against the Defendant arising out of this investigation, known to the DOJ at the time of this agreement.

7.      **Sentencing Factors**: The parties agree that the Court must first determine the applicable advisory guideline range, then determine a reasonable sentence considering that range and the factors listed in 18 U.S.C. § 3553(a). Where the parties agree that sentencing factors apply, such agreement constitutes sufficient proof to satisfy the applicable evidentiary standard.

8.      **Relevant Conduct**: The parties agree that the Defendant's relevant conduct will be determined pursuant to U.S.S.G. §§ 1B1.3 and 2B1.1. The parties agree that the following apply: (1) a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A) because the offense involved more than ten victims; and (2) at least a 3-level adjustment pursuant to U.S.S.G. § 3B1.1(a) because of the Defendant's role.

9.      **Acceptance of Responsibility**: The Defendant must demonstrate to the Court that he fully admits and accepts responsibility under U.S.S.G. § 3E1.1 for his unlawful conduct in this case. If the Defendant qualifies for a 2-level decrease in the offense level pursuant to U.S.S.G. § 3E1.1(a) and the offense level prior to the operation of that section is level 16 or greater, the DOJ agrees to move prior to or at the time of sentencing for an additional 1-level decrease in the Defendant's offense level, pursuant to U.S.S.G. § 3E1.1(b). The DOJ reserves the right to change this recommendation if the Defendant, between plea and sentencing, commits any criminal offense, obstructs or attempts to obstruct justice as explained in U.S.S.G. § 3C1.1, or acts inconsistently with acceptance of responsibility as explained in U.S.S.G. § 3E1.1.

10.     **Government Recommendation**:   The DOJ is free to seek any sentence within the Guidelines range determined by the Court.

11.     **Disclosure of Financial Information**:  The Defendant agrees to fully disclose all assets in which he has any interest or over which the Defendant exercises control, directly, or indirectly, including those held by a spouse, nominee, or third party.  The Defendant agrees to truthfully complete the Financial Disclosure Statement provided herein by the earlier of 14 days from the Defendant's signature on this plea agreement or the date of the Defendant's entry of a guilty plea, sign it under penalty of perjury, and provide it to both the DOJ and the United States Probation Office.  The Defendant agrees to provide updates with any material changes in circumstances, as described in 18 U.S.C. § 3664(k), which occur prior to sentencing, within seven days of the event giving rise to the changed circumstances.

The Defendant expressly authorizes the DOJ to obtain a credit report on the Defendant. The Defendant agrees to provide waivers, consents, or releases requested by the DOJ to access records to verify the financial information.  The Defendant also authorizes the DOJ to inspect and copy all financial documents and information held by the U.S. Probation Office.

The parties agree that the Defendant's failure to timely and accurately complete and sign the Financial Disclosure Statement, and any update thereto, may, in addition to any other penalty or remedy, constitute the Defendant's failure to accept responsibility under U.S.S.G § 3E1.1.

12.     **Transfer of Assets**:  The Defendant agrees to notify the DOJ before the Defendant transfers any interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by the Defendant, including any interest held or owned under any name, including trusts, partnerships and corporations.

13.     **Restitution**:   Pursuant to 18 U.S.C. § 3663(a)(3), the parties acknowledge that determination of the identities, addresses, and loss amounts for all victims in this matter is a complicated and time-consuming process.  To that end, the Defendant agrees, pursuant to 18 U.S.C. § 3664(d)(5), that the Court may defer the imposition of restitution until after the sentencing; however, the Defendant specifically waives the 90-day provision found at 18 U.S.C. § 3664(d)(5) and consents  to the entry of any orders pertaining to restitution after sentencing without limitation.  In the event any entity or any co-conspirators enter into a resolution with DOJ, or are sentenced by any federal court after trial, the DOJ agrees to recommend at sentencing that the Defendant's restitution shall be joint and several with the company and/or those individuals. By signing this agreement, the Defendant does not concede that the amount of restitution he owes is equal to that of the company and/or individuals.

The Defendant understands and agrees that the total amount of any monetary judgment that the Court orders the Defendant to pay will be due and payable immediately.  The Defendant further understands and agrees that pursuant to 18 U.S.C. § 3614, the Defendant may be resentenced to

any sentence which might have originally been imposed if the Court determines that the Defendant has knowingly and willfully refused to pay a fine or restitution as ordered or has failed to make sufficient bona fide efforts to pay a fine or restitution. Additionally, the Defendant understands and agrees that the DOJ may enforce collection of any fine or restitution imposed in this case pursuant to 18 U.S.C. §§ 3572, 3613, and 3664(m), notwithstanding any initial or subsequently modified payment schedule set by the Court. The Defendant understands that any monetary debt the Defendant owes related to this matter may be included in the Treasury Offset Program (TOP) to potentially offset the Defendant's federal retirement benefits, tax refunds, and other federal benefits.

Pursuant to 18 U.S.C. 3612(b)(F), the Defendant understands and agrees that until a fine or restitution order is paid in full, the Defendant must notify the DOJ of any change in the mailing address or residence address within 30 days of the change. Further, pursuant to 18 U.S.C. 3664(k), the Defendant shall notify the Court and the DOJ immediately of any material change in the Defendant's economic circumstances that might affect the Defendant's ability to pay restitution, including, but not limited to, new or changed employment, increases in income, inheritances, monetary gifts, or any other acquisition of assets or money.

14.     **Waiver of Appeal/Post-Conviction Relief**:  The Defendant knowingly and voluntarily waives the right to appeal from any aspect of the conviction and sentence on any grounds, except for a claim that: (1) the sentence imposed exceeds the statutory maximum, or (2) the Court arrives at an advisory sentencing guideline range by applying an upward departure under the provisions of Guidelines Chapters 4 or 5K, or (3) the Court exercises its discretion under 18 U.S.C. § 3553(a) to impose a sentence which exceeds the advisory guideline sentencing range.  Should the Defendant seek an appeal, despite this waiver, the DOJ may take any position on any issue on appeal.  The Defendant also waives the right to file any collateral attack, including a motion under 28 U.S.C. § 2255, challenging any aspect of the conviction or sentence on any grounds, except on grounds of ineffective assistance of counsel, and except as provided in Rule 33 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3582(c)(2).

15.     **Court Not Bound**:  The Court is not bound by the recommendations of the parties or of the presentence report (PSR) writer.  Because this agreement is made under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, defendant may not withdraw any guilty plea or rescind this plea agreement if the Court does not follow the agreements or recommendations of the parties.

16.     **Full Disclosure/Reservation of Rights**:  The DOJ will fully inform the PSR writer and the Court of the facts and law related to the Defendant's case.  Except as set forth in this agreement, the parties reserve all other rights to make sentencing recommendations and to respond to motions and arguments by the opposition.

17.     **Breach of Plea Agreement**:  If the Defendant breaches the terms of this agreement, or commits any new criminal offenses between signing this agreement and sentencing, the DOJ is

relieved of its obligations under this agreement, but the Defendant may not withdraw any guilty plea. In exchange for the United States entering into this agreement, Defendant agrees that (a) the facts set forth in Paragraph 4 (Admissions) of this agreement shall be admissible against the Defendant under Fed. R. Evid. 801(d)(2)(A) in the following circumstances: (i) for any purpose at sentencing; and (ii) in any subsequent proceeding, including a trial in the event the Defendant does not plead guilty or withdraws the Defendant's guilty plea, to impeach or rebut any evidence, argument or representation offered by or on the Defendant's behalf; and (b) the Defendant expressly waives any and all rights under Fed. R. Criminal P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Paragraph 4 (Admissions) of the agreement to the extent set forth above.

18. **Memorialization of Agreement**: No promises, agreements or conditions other than those set forth in this agreement will be effective unless memorialized in writing and signed by all parties listed below or confirmed on the record before the Court. If the Defendant accepts this offer, please sign and return the original of this agreement to Trial Attorney Emily Scruggs.

Sincerely,

SANDRA MOSER
ACTING CHIEF, FRAUD SECTION

By: _____

Thomas B.W. Hall
Assistant Chief
Criminal Division, Fraud Section

Jennifer G. Ballantyne
Trial Attorney
Criminal Division, Fraud Section

Emily Scruggs
Trial Attorney
Criminal Division, Fraud Section

I have carefully reviewed every part of this agreement with my attorney. I understand and voluntarily agree to its terms. I expressly waive my rights to appeal as outlined in this agreement. I wish to plead guilty because, in fact, I am guilty.

7/15/17
Date

_Dennis Balius_
Dennis Balius, the Defendant

I represent the Defendant as legal counsel. I have carefully reviewed every part of this agreement with the Defendant. To my knowledge, the Defendant's decisions to make this agreement and to plead guilty are informed and voluntary ones.

7/15/17
Date

Whitney Boise, Attorney for the Defendant