SANDRA MOSER
Acting Chief, Fraud Section
United States Department of Justice
**\s\ EMILY SCRUGGS**
Jennifer Ballantyne
Ankush Khardori
Trial Attorneys
Fraud, Section Criminal Division
United States Department of Justice
1400 New York Ave. NW
Washington, DC  20530
Telephone:  (202) 616-2488
Emily.Scruggs@usdoj.gov
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:17-CR-273-HZ** |
| **v.** | |
| | **GOVERNMENT'S SENTENCING** |
| **DENNIS BALIUS,** | **MEMORANDUM** |
| **Defendant.** | **Sentencing: July 9, 2018 at 9:00 AM** |

The United States respectfully recommends that the Court sentence the Defendant to a term of imprisonment within the United States Sentencing Guidelines ("Guidelines") range of 57 to 71 months, with a three-year term of supervised release.  The United States also requests that the Court enter an Order of Restitution in the amount of $170,825.87, to be paid jointly and severally to victims.

I.    **FACTUAL BACKGROUND**

A.    **Company A and the Defendant**

Company A – an Oregon corporation headquartered in Rosemont, Illinois – operated a plant in the Portland area where it manufactured aluminum extrusions for a variety of downstream uses such as window frames, ladders, highway guardrails, and airplane parts.[1]

The Defendant first began working at the plant on or about February 21, 1977 and, in 1996, transferred to the plant's main tensile testing lab (the "lab"), where he eventually became Tensile Lab Supervisor.  His responsibilities included overseeing the lab, reviewing test results, training lab technicians, and conducting floor audits.

B.    **Tensile Testing and the ASTM International Standards Organization**

Tensile testing is a process by which a small sample of aluminum extrusion is slowly stretched and then ripped apart by a tensile testing machine, which measures the force applied to the aluminum sample at each stage of the test.  Tensile testing measures three critical mechanical properties of an aluminum extrusion sample:

1.    *Yield Strength ("yield"):*  This is the point at which the aluminum extrusion sample becomes permanently and irreversibly deformed during tensile testing.

2.    *Ultimate Tensile Strength ("UTS"):*  This is calculated from the maximum amount of stress an aluminum extrusion can sustain before the aluminum extrusion sample breaks during tensile testing.

3.    *Elongation:*  This is the increase in the length of the aluminum extrusion sample before it breaks during tensile testing.

ASTM International is an organization that sets mechanical properties specifications for aluminum.

---

[1] Company A acquired the plant in or about 2002.

Government's Sentencing Memorandum
*U.S. v. Balius*, 3:17-CR-273-HZ                                                                            Page 2

### C.    The Offense Conduct

The Defendant was first taught how to alter mechanical properties results when he began to work in the lab in order to ensure that Company A's unreliable and inconsistent production practices would not prohibit aluminum extrusions from shipping to customers.

In or about 2003 and throughout the course of the scheme, the Defendant supervised 21 lab technicians. As a supervisor, the Defendant gave guidance to lab technicians – using e-mail and Post-it notes – on whether to make alterations to mechanical properties test results, and the Defendant also routinely instructed lab technicians to falsify elongation results, contrary to the ASTM specifications.

For instance, on or about March 18, 2014, the Defendant emailed a lab technician about a tensile test for Customer A stating, "move up," which indicated that the Defendant wanted the lab technician to falsify the failing mechanical properties results to passing. On or about March 20, 2014, Company A, within the District of Oregon, shipped Customer A, in Renton, Washington, the fraudulent Certificate of Mechanical Properties indicating that the order passed testing in accordance with the ASTM specifications. Customer A would not have accepted the materials if it had known the Certificate falsely represented that the materials met ASTM specifications.

The Defendant created a set of written procedures to inform lab technicians of how to alter test results, and the Defendant trained and directed lab technicians to train new hires to falsify mechanical properties results. In some instances, the Defendant also accessed the results in Company A's computer software and altered them himself.

In addition to altering test results, the Defendant also engaged and directed others to engage in conduct that violated relevant ASTM specifications. This included increasing the speed of the tensile testing machine, cutting samples for testing outside of the required size specifications,

falsifying tensile test results in the event a sample passed hardness testing, and performing only one retest in the event of a failed sample.

In order to conceal the scheme, the Defendant instructed at least two lab technicians not to discuss the alterations occurring in the lab with anyone else at Company A and to turn the speed of the tensile testing machine down to the proper level before customer visits or lab audits.

### D.    Company A's Disclosure to the Government and Subsequent Investigation

Company A notified the Department of Justice in September 2015 that it had learned that employees in its testing facility were likely altering test results on a regular basis from 2006 through August 2015. Company A subsequently determined, based on its review of available records, that the Defendant and other employees altered the mechanical properties of Company A's aluminum extrusions approximately 4,126 times, which allowed Company A to avoid slower production rates, a loss in profits, and customers refusing to accept the non-complying aluminum.

## II.    PROCEDURAL BACKGROUND

On July 26, 2017, the Defendant pled guilty to a one-count Criminal Information charging him with Mail Fraud, in violation of Title 18, United States Code, Sections 1341 and 2.

The maximum penalty for a violation of Title 18, United States Code, Section 1341, is imprisonment for not more than twenty years, a $250,000 fine, or both. The Defendant is also subject to supervised release for a term of not greater than three years.

## III.    GUIDELINES CALCULATION

The Probation Office correctly determined that under the Guidelines, the Defendant's Base Offense Level is seven for mail fraud. *See* U.S.S.G. § 2B1.1(a)(1). The parties and the Probation Office agree (1) that a three-level increase is appropriate because the Defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive

(*see* U.S.S.G. § 3B1.1(b)) and (2) that a further two-level increase is appropriate because the offense involved ten or more victims (*see* U.S.S.G. § 2B1.1(b)(2)(A)).

As discussed in further detail below, the parties agree as to the method for calculating loss under Section 2B1.1(b) and that an additional 14-point increase is appropriate based on a gain of $1,417,099 to the Defendant and others from the offense conduct.

Finally, the parties and the Probation Office agree that the Defendant is entitled to a two-level reduction for acceptance of responsibility.  The Defendant has assisted authorities in the investigation and prosecution of his own misconduct by pleading guilty prior to indictment, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.  Therefore, the United States moves the Court, under Section 3E1.1(b), to grant the Defendant an additional one-level reduction in the offense level for acceptance of responsibility if the Defendant receives the two-level reduction for acceptance of responsibility.

It is the government's understanding that the only aspect of the sentencing guidelines' calculation upon which the parties disagree is an enhancement under Section 3B1.3 related to loss and abuse of position of public or private trust.

A.    **Calculation of Loss**

The United States and the Defendant agree that the appropriate loss figure in the case is $1,417,099.  The starting point for determining loss under the Sentencing Guidelines is identifying actual loss, which is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, App. Note 3(A)(i).  Loss is determined to be the "greater of actual loss or intended loss" under the Guidelines.  *See* U.S.S.G. § 2B1.1.  "The court need only make a reasonable estimate of the loss, given the available information."  U.S.S.G. § 2B1.1, App. Note

3(C).  The Ninth Circuit instructs district courts "to adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented" and has noted that district courts are not "obligated to search for the perfect theoretical or statistical fit."  *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001).  "[T]here exists no rigid formula for the sentencing court to follow in attempting to determine the victim's loss in fraud cases when the amount of neither actual nor intended loss is readily apparent."  *W. Coast Aluminum Heat Treating Co.*, 265 F.3d at 991.

The victims in this case did not receive what they bargained for because the extrusions sold to them by Company A did not meet industry standard specifications as promised and certified. Typically in such a case, the court could determine actual loss by comparing the price paid by the victims for the product with its market value.  U.S.S.G. § 2B1.1, App. Note 3(E)(i); *see also United States v. Townsley*, 2012 WL 3137989, at *15-16 (N.D. Cal. Aug. 1, 2012) (finding that the appropriate calculation of loss in a case involving a scheme to defraud customers by labeling fertilizer as organic when it contained chemicals prohibited for use in organic farming was the gross sales minus the fair market value of the non-organic fertilizer).  However, here, it is difficult to quantify the fair market value of extrusions with altered test results because extrusions were unique and manufactured to each customers' specifications.  There is no market for these unique products, and as a result, applying market value as a substitute for loss is not an appropriate measure of actual loss.

The parties agree that under these circumstances, the unique facts of this case support calculating gain as an alternative measure of loss.  The sentencing guidelines instruct courts to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  U.S.S.G. § 2B1.1, App. Note 3(B).  The parties agree

this number is $1,417,099 – the total of the bonuses earned by the Defendant when he was overseeing the test alteration scheme and "the additional before-tax profit to [Company A] resulting from the relevant conduct of the offense."  U.S.S.G. § 8A1.2, App. Note 3(H).

**B.      Abuse of Position of Public or Private Trust**

The Probation Office and the United States agree that the Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, resulting in a two-level increase pursuant to U.S.S.G. § 3B1.3.[2]

The Ninth Circuit has explained that "the presence . . . of 'professional or managerial discretion' represents the decisive factor in deciding whether a defendant occupied a position of trust."  *United States v. Adebimpe*, 819 F.3d 1212, 1217 (9th Cir.), *cert. denied*, 137 S.Ct. 317 (2016).  Persons in a position of public or private trust "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature," and their "substantial discretionary judgment . . . is ordinarily given considerable deference."  U.S.S.G. § 3B1.1, n.1.  In order to support the adjustment, "a position of trust . . . must be established from the perspective of the victim."  *United States v. Thomsen*, 830 F.3d 1049, 1073 (9th Cir. 2016) (internal quotations omitted).

The Defendant held a position of public or private trust characterized by professional or managerial discretion.  The Defendant worked as a Tensile Lab Supervisor at Company A from 2003 through September 2015 and, during this period, directly supervised 21 lab technicians responsible for conducting the tensile tests.  The Defendant was responsible for overseeing the main tensile testing lab, reviewing test results, training lab technicians, and conducting floor audits,

---

[2]  In this case, it is not impermissible double counting to apply both the adjustment for aggravating role and abuse of position of trust.  *See* U.S.S.G. § 3B1.3 ("If this adjustment is based upon abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)"); *see also United States v. Jenkins*, 633 F.3d 788, 809 n.9 (9th Cir. 2011).

and he exercised managerial and sole discretion over the main tensile testing lab, including unchecked authority to falsify, approve, and certify aluminum – thus allowing falsified aluminum to ship to hundreds of customer-victims. *See United States v. Swanson*, 703 Fed. Appx. 487 (9th Cir. June 30, 2017) (unpublished) (finding district court properly applied enhancement because defendant "exercised extreme managerial discretion, including unchecked authority and access to funds, allowing disbursement of checks to herself, her other businesses, and her coconspirators"); *United States v. Samuel*, 663 Fed. Appx. 508, 513 (9th Cir. Oct. 5, 2016) (unpublished) (holding that district court properly applied enhancement because defendant held a managerial role as the owner of the real estate firm and mortgage brokerage and used the position to perpetrate the scheme). For instance, lab technicians routinely checked with the Defendant – by using post-it notes, corresponding by email, and speaking to him – regarding whether to falsify test results. In addition, the Defendant was able to go into the computer system behind any lab technician to alter any test results as needed.

The customer-victims relied on the tensile test results conducted by the Defendant and his supervisees and transmitted to them on certifications provided by Company A. *See, e.g.*, *United States v. Jenkins*, 578 F.3d 745, 752 (8th Cir. 2009) (finding an abuse of trust because insurance companies relied on defendant insurance agent to be honest and forthright with them by accurately reporting information, and stating that "[s]uch circumstances are hallmarks of a position of private trust"); *United States v. Fazio*, 487 F.3d 646, 659 (8th Cir. 2007) (affirming district court's enhancement for defendant real estate agent where the victim, "an out-of-state company [was] relying on him to be honest and forthright with them"). The customer-victims had no way to know that the certifications were false without destroying part of their order from Company A due to the

nature of tensile testing, and as a result, they relied on the certifications provided by the Company and altered by the Defendant and his supervisees at his direction.

In short, the Defendant's position significantly facilitated the commission of the crime "by making the detection of the offense or the defendant's responsibility for the offense more difficult." U.S.S.G. § 3B1.3, n.1.

*          *          *

Applying the abuse of position of trust adjustment and using a 14-level increase for loss, the Defendant's adjusted offense level is 25, and his sentencing guideline range is 57 to 71 months.

## IV.    STATUTORY SENTENCING FACTORS

The sentencing guidelines discussed above are advisory in nature. *United States v. Booker*, 543 U.S. 220 (2005). However, they are one of the statutory factors that sentencing courts must consider when imposing a sentence. *See* 18 U.S.C. § 3553(a)(4); *United States v. Rita*, 551 U.S. 338 (2007). They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 39 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The remaining factors the court must consider include the Defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the Defendant. 18 U.S.C. § 3553(a)(1)-(2).

### A.    The Nature and Circumstances of the Offense

The Defendant's conduct caused falsified certifications on mechanical properties test results to be distributed in approximately 4,000 orders to over 2,000 victim companies – resulting in an unjust gain of approximately $1,417,099. Even that figure, however, understates the

Defendant's conduct because for the entire period of the scheme, every extrusion that passed through the Defendant's tensile testing lab was at risk of alteration.

Indeed, Company A was unable to identify every order falsified by the Defendant and his supervisees for several reasons. *First*, the data in the tensile testing machine's software was not automatically backed up and was deleted in the ordinary course of business – resulting in gaps in the records for: (1) UTS at various points in 2008 and 2009, and from late October 2010 through early August 2012 (75% of the conspiracy period); and (2) yield from early August 2008 through early August 2012 (38% of the conspiracy period). *Second*, the records do not capture instances where test results were entirely manufactured (as opposed to modified). *Third*, Company A was unable to detect elongation falsifications, which the Defendant admits was a routinely falsified metric.

Out of an abundance of caution, Company A notified all of its customers that received tested extrusions during the conspiracy period that they may have received substandard extrusions, and many of those customers requested refunds or incurred costs to investigate further. Between September 2015 and 2017, Company A paid approximately $2,046,792 in refunds to customers who returned, or incurred costs to independently test, extrusions that were potentially affected by the Defendant's alterations scheme.

In addition to the amount Company A paid in refunds, victims suffered additional costs to investigate and notify their own customers of the risk that they may have sold them substandard aluminum. The Defendant understood the nature of their customers' business and that many of Company A's extrusions were delivered to distributors.

By routinely engaging in this scheme over nearly a decade, the Defendant compromised the integrity of each order Company A delivered to its customers. For example, the victim

identified as Customer A in the Plea Agreement was notified by Company A in October 2015 that it may have received substandard aluminum extrusions as a result of the Defendant's scheme. Customer A immediately quarantined Company A's products and began the process of testing and identifying its own sales of Company A extrusions to its downstream customers. To put the scale of its effort in perspective, Customer A distributes metal to over 40,000 customers throughout North America and considers Company A to be one of its top 20 suppliers. Customer A sold extrusions from Company A's Portland plant to at least 500 customers. Those customers manufacture items such as scaffolding and boats. The process of identifying and contacting potentially affected customers, and retesting and returning quarantined inventory, was resource-intensive. For instance, in the last quarter of 2015, one of Customer A's attorneys spent 150 hours investigating the impact of the Defendant's scheme on Customer A's business. As many of the impact statements submitted by victims in this case indicate, this was hardly a harmless crime.

The seriousness of the Defendant's conduct is also evidenced by the actions he undertook to ensure the scheme was concealed. For example, the Defendant instructed at least two lab technicians not to discuss the alterations with anyone else at Company A. Though the lab had a practice of increasing the tensile testing machine in spite of ASTM specifications to test more aluminum, the Defendant instructed lab technicians to ensure the tensile testing machine speed was adjusted to the correct speed before customer or lab audits.

In addition, the Defendant was interviewed by counsel for Company A on six occasions between August 2013 and August 2015, but his initial lack of candor – *i.e.*, his continued efforts to cover up the scheme at the lab – allowed the scheme to continue for two years longer. It was not until an interview on August 13, 2015 that the Defendant acknowledged the full extent of the scheme.

A term of imprisonment is warranted based on the serious nature of the offense, the number of victims, the uncertainty that the scheme created surrounding the supply chain of products shipped by Company A over a 13-year period, the Defendant's leadership role, and the Defendant's efforts to conceal the scheme.

### B.      The History and Characteristics of The Defendant

The history and characteristics of the Defendant identified in the PSR do not change the United States' position.

### C.      The Need for the Sentence Imposed

A sentence within the Guidelines range is necessary to affirm the seriousness of the offense and promote respect for the law.  The crime to which the Defendant has pled is indeed serious, and the policing, investigating, and prosecution of such an offense imposes significant costs.  This scheme in particular has consumed disproportionate law enforcement and prosecutorial resources given its intricate nature and significant number of supporting players.

The seriousness of this offense is also reflected in the victimization of over two thousand companies throughout the country.  These companies, many of which were small businesses, depended on the quality of aluminum extrusions they purchased from Company A and risked their own reputations by incorporating substandard materials into their own products.

Given these considerations – as well as the Defendant's supervisory role and his efforts to conceal the scheme when investigated by the company – a prison sentence within the guidelines range of 57 to 71 months, followed by a three year period of supervised release, would promote general deterrence.

## V.      RESTITUTION

Finally, the parties agree that restitution must be ordered in this case (*see* 18 U.S.C. § 3663A; U.S.S.G. § 5E1.1) and that there is a factual basis to support a restitution order of

$170,825.87, to be paid jointly and severally to ten victims.  As discussed above, Company A refunded many of its direct customers the costs of affected or potentially affected orders.  However, many downstream customers did not learn of the scheme or its affects until they were notified by the government.  Although over two dozen victims submitted claims for restitution, ten victims provided analysis and documentation to support claimed costs resulting from their efforts to investigate whether they received substandard aluminum extrusions.  These costs included attorney fees, testing fees, hourly wages for staff to research orders, and costs to replace products.[3]

Respectfully submitted,

SANDRA MOSER
Acting Chief, Fraud Section
U.S. Department of Justice

By: */s/ Emily Scruggs*
EMILY SCRUGGS
Jennifer Ballantyne
Ankush Khardori
Trial Attorneys

Date: July 1, 2018

---

[3]  The investigative costs incurred by these victims were incurred *during* the government's investigation of this case and are not precluded by the United States Supreme Court's recent decision in *Lagos v. United States*, No. 16-1519 (holding that a provision of the Mandatory Crime Victim Restitution Act that affords restitution for "expenses incurred during the investigation or prosecution of the offense" does not provide for expenses incurred during private investigations that arise *before* participation in the government's investigation or prosecution of the offense).